Good morning, Your Honors. May it please the Court, Joseph S. Port on behalf of the Petitioner, me, Hua Wei. This case is before you today after an affirmance without opinion by the Board of Immigration Appeals. Basically, the main thrust and the strongest argument in Petitioner's favor is to establish a well-founded fear of persecution. Such a finding requires an objective and a subjective fear. And moreover, even a 10% chance that the applicant will be persecuted in the future is enough to meet that standard. Here we have a credible record. The immigration judge specifically found the petitioner credible. She specifically fears return to Indonesia because she fears her ethnicity, which is Chinese, her religion, which is Christian, and the fact that she's a woman that she may be raped as a result. Recently, this Court and, as a matter of fact, Judge Fletcher just authored an opinion, a matter of sale, or sale v. Ashcroft, S-A-E-L. That decision is located at 2004 U.S. App Lexis. You're familiar with the decision? Yes. In that decision, the Court found that a well-founded fear of persecution can be established in one of two ways. The first way is to show a pattern in practice of persecution. My focus today is going to be on the latter, which is that they can prove that they're a member of a disfavored group coupled with the showing that the alien in particular is likely to be targeted as a member of that group. So there's basically two elements. One, you have to be in a disfavored group and you have to be singled out for persecution, and they operate in tandem. And basically, the Court held that the more serious and widespread the threat to the group, the less showing that needs to be made. And that showing essentially is 10 percent. Now, once there's a widespread showing that there's — once there's a showing of widespread discrimination, then it would obviously have to go below 10 percent. Now, we have a very, very strong record with lots of supporting documents establishing the type of treatment that the Indonesians suffer. At page 206 of the administrative record, the 1997 country report, which predates even the riots, already stated that the government continued to commit serious human rights abuses. It also mentions prior to the riots that the socioeconomic and political tensions in many instances between the Muslims and the Chinese were key factors to the problems, and that the government has not resolved anything and they really have taken no measures to do anything about it. There's many mentions of mob violence in the record, and there's also mention, as in sale, that this discrimination has a big — has been occurring for many decades, if not centuries. They were talking about how in 1959, noncitizen ethnic Chinese have been denied to run the businesses in Indonesia. The regulations prohibit the operation of Chinese schools. The record also has some gruesome photographs, Your Honors, of people being raped and killed during the riots. These were all admitted into the record without objection. I submit to the Court that these do establish that there is a pattern of — that they are a disfavored group. Moving along from there, I want to apply a little bit of the circumstances as they particularly apply to the Petitioner. First of all, this Petitioner has greater equities, in my opinion, than the Petitioner in sale. Several of the instances of harm that occurred to this Petitioner were at the — at the — were initiated by the government. She was shot at by military personnel at a burial procession. Her — when she was in grade school, the Army ransacked and burned her school. Later on, she also suffered during the riots. One thing I also wanted to bring to the Court's attention, nowhere in the sale decision was that Petitioner specifically physically harmed. They received threats, but there was no physical violence. There is no physical violence against this Petitioner either. But I think it's easier to infer the motivation behind the acts, especially since the government was responsible for some of the mistreatment that she had. Well, we have to make some determination of how severe what happened to her was. And the incidents you've mentioned happened when she was a child, and then she goes to school in the United States, doesn't she? Yes, she came to school for a while, Your Honor, and she returned back to Indonesia. She wasn't very much afraid when she went back. Well, sure she was afraid, Your Honor. Why? Why was she afraid? Because I think it would be... She wasn't afraid of her life when she went back, was she? She didn't apply for asylum when she was studying as a student. No, Your Honor. I don't know. So why doesn't that wipe all that out? Well, it shouldn't wipe it out, in my opinion, because, granted, she did return back. She left the country and returned back to Indonesia. But each time she's returned, she's had more occurrences of harm. And the fact that she leaves and comes back, there's not nothing in the record. You have four incidents, as I see it, that happened a long time ago, and she's been in and out of Indonesia and in the United States, and she's never applied for asylum. And how can you say that any one of those was scary enough to warrant asylum when she didn't ask for it? Well, at the time she first left in 1988, I'm not entirely sure as to the exact date, but that was well before the Indonesian main riots, and there really wasn't as succinct grounds for asylum for Indonesians as there are now. Okay. Well, I would say the main event, one of the riots, was it 98? Correct, Your Honor. May 98 riots. So we've got to look at those. Well, during that incident, she wasn't specifically physically harmed, but the rioters did make it all the way up to the front of her house. They threw stones at her house. And the very interesting and gruesome part of this record is she was watching the media reports on TV, but live she was hearing the screams of the people being tortured and killed outside of her residence. And these occurred after she came to the United States. Now, granted, the last entries into the United States, the record's a tiny bit unclear, but I would argue that there's a reading in favor of Petitioner that it was for family reunification purposes. Well, she pays money for police escort to the airport and goes to Singapore, and she comes back in a month to Indonesia. Correct. Well, that doesn't sound like she's very frightened. Well, she had some family members left behind, Your Honor, and I think I believe there's precedent stating that if you're making arrangements to have your family removed and for your family's safety, that it shouldn't be counted against you. And nevertheless, even after her last entry into Indonesia and before she came back to the United States, her church was specifically targeted. There was rioters that entered the church, and they threatened the lives of the Petitioners, calling them anti-Muslims. And during this event... They threatened the what? They threatened the Petitioner, or the parishioners, I apologize, that were inside of the church. This was in November 1998. It's at the record at pages... She wasn't there. Yes, she was. And then the record is what page? 125. And as a result of this attack, they resulted in six deaths and eight injuries. Basically what happened was the rioters came into church, and apparently there was some sort of a plant behind the church. It was probably a natural gas or a propane plant or something, and they were able to thwart the rioters, stating that, hey, if you blow this up, everybody's going to go because you might set off a gas plant behind us. But nevertheless, every time Petitioner has returned, she has suffered more harms or at least more threats. And my argument to this Court is that in the aggregate, if you look at the sum of all of these happenstances, she clearly does qualify, and that this is more than what occurred in Sale. Since in Sale, it was just general mob violence. Here we have specifically the military at least condoning, if not taking out, some of these actions during her earlier days, if possible, Your Honors. I'd like to reserve my remaining time. May it please the Court. My name is Luis Perez. I'm the attorney in charge of Petitioner County, representing the respondents. Your Honor, I think that the main issue here is whether Ms. Oye established an individualized risk of being singled out. And I think this case is distinguishable from Sale. If we take a look at the facts in Sale, all of the incidents that Ms. Sale suffered, she was singled out, specifically singled out, at the boarding school, and telling her that the neighborhood did not belong to the Chinese people. So she was specifically singled out at that event. It wasn't a boarding school. It was a boarding house. Okay. I'm sorry. And obviously, you know better, much better, the record in Sale than me, because you were the one who wrote that. But as I understand also, she was discriminated by her teachers in school. And in her neighborhood, her neighbors who knew her vandalized her car and told her specifically, you better be careful. So there were instances where Ms. Sale was singled out. Even if we take Brother Counsel's argument at face value, and the facts are undisputed in this case, Ms. Oye was never singled out. For example, if we take the 1998 riots, it's true that people threw stones at her house. But there is no evidence that they threw stone at her house because they knew that Ms. Oye lived at that house. It was in a Chinese community during the riots. All of the houses, most of the houses, most of the stores in that community were either vandalized, stones were thrown. So it's in the context of the civil strikes. There was no evidence that she was singled out. Even in the incident of the church, I look at page 125 of the administrative record, and all that she heard was that her church was going to be burned. And she left. And the church that was burned was another church that was close to a mosque. So even if we take all of the evidence, all of her experiences in Indonesia, she was never singled out. And I think that is the main distinction between this case and Sale. And that is why the disfavored group standard doesn't apply to this case, and why she has failed to establish a well-founded fear of future persecution. If the judges have any questions. I think we have an end. Thank you. I wonder if you could focus on that incident in the church, because she heard news the other day that she was being persecuted. Is there something more? Let me check, Your Honor. There is a little bit more explanation of the situation on page 415 of the certified administrative record in her asylum declaration. Well, how do you deal with, I'm looking now on page 128 of the hearing, was your own church burned down? Answer, yes but no. Our church didn't get burned down. Almost it did, because I think there was a gas factory behind the church that prevented people. They said don't burn the church, don't burn it. I mean, the implication is that her church wasn't burned. Is that correct? I never said that her church was burned. I said that they were threatening to set fire to the church, but that they were thwarted by mentioning that there was a gas plant located behind the church. Oh, I see. Okay. You know, I don't really get it. She elaborates with some vivacity in the asylum application on this experience. Why wasn't that brought out at the hearing? Your Honor, I don't know why it wasn't brought out at the hearing. I wasn't representing the Petitioner at that time. I — Usually we have just the opposite problem, that the asylum is badly done and the hearing is better, but the hearing looks worse. I mean, in the hearing, you can almost get nothing out of it. As you say, in the asylum application, it's a good deal. That's correct, Your Honor. But, however, there was no — there was no finding that she was not credible. Perhaps the questions weren't asked, but there was a specific finding she was credible. Maybe some details didn't get in there. But she is credible, and we have to take the record at face value and take it as truth. Now, I would disagree with Respondent's counsel that the comparatively low level doesn't apply. I think the record does establish the persecution of Native Chinese Christians in Indonesia. Now we need to see whether — we need to see whether what she suffered is comparatively low. And I think what she has suffered exceeds comparatively low. She's had several problems, and those are not disputed by the government, either. And the task here is to apply that to the comparatively low analysis. And if we take everything in the aggregate, as this Court is supposed to, I don't — I don't see that there's a contrary — Well, you say comparatively low, but usually when we have spoken of persecution, we say it must be severe. Now, is this a low grade of severe persecution? Well, Your Honor, it doesn't necessarily — that's when we're doing the determination in terms of past persecution. When you're doing it in terms of well-founded fear, it doesn't have to be severe persecution. Anything that's happened to the applicant is relevant to determining the well-founded fear. This comparatively low analysis necessarily presumes that we're outside of the realm of past persecution and only focusing on a well-founded fear, because if she would have established past persecution, she'd have a rebuttable presumption. But the judge found she didn't suffer past — No, it's just the fear. Correct. And all of these are relevant. In fact, in — in Sale, this Court stated that Sale met the burden with evidence of past threats and violence, and they cited a case called Avitova-Eliseva, which is 213F3-1192, 9th Circuit 2000. And they also cited Hoksha and Hartouni, also cases where some of the — some of those cases did and others didn't. But the fact of the matter is, Sale didn't have any specific personal physical harm. They were all threats, and most of them weren't carried through. And the damage that was done were to her surroundings, her boarding house, and to her car. Here in the record, there's also many indications that — that everything was racially motivated as well. As the people were throwing stones at their house, I believe somebody testified that they were screaming, kill the Chinese. I don't see how much more specifically targeted an individual needs to be. When the military is firing bullets at you, I don't think they need to call the names of the person that they're shooting at to specifically target them either. I clearly believe that there's not substantial evidence supporting the decision and that there's more than substantial evidence meeting a comparatively low standard in this case, given the aggregate of her past harms. Thank you, counsel. Thank you. The case is heard and will be submitted. The next case on the oral argument calendar is Lalonde v. Ashcroft.
judges: B. Fletcher, Noonan, Thomas